REILLY v. TROY BRICK CO.

(Supreme Court, Trial Term, Rensselaer County. June, 1905.)

1. MASTER AND SERVANT—SAFE PLACE TO WORK—PROTECTION AGAINST LANDSLIDE.

A master who was working a clay bank about 65 or 70 feet high, and having a slope equal to nearly one-third of its height, and which extended for several hundred feet in length, and the face of which was in a state of nature, no undermining process having been resorted to, was not bound to remove the top of the bank in order to guard against an unanticipated giving way of the bank and consequent landslide, where the extent of the removal which would be necessary to prevent such a catastrophe was indefinite and conjectural.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, § 209.]

2. SAME—ANTICIPATION OF LANDSLIDE—DUTY TO KEEP WATCHMAN.

.A master, engaged in working a clay bank, was not bound to anticipate a landslide and keep a watchman to warn the servants of its approach, where the bank was in a state of nature, and had a slope equal to one-third of its height, and was not undermined, so that no such catastrophe was to be anticipated, and where it was not customary to take such precaution, and, in case it was taken, the approach of the landslide would be so sudden and so difficult of observation that the precaution would be likely to prove unavailable for the protection of servants working on the bank.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, § 269.]

Action by Celia Reilly, as administratrix of the estate of David Reilly, deceased, against the Troy Brick Company. On motion for nonsuit, reserved until after verdict, under Code Civ. Proc. § 1187. Complaint dismissed.

George B. Wellington, for plaintiff. .

Patterson, Bulkeley & Van Kirk (Charles C. Van Kirk, of counsel), for defendant.

COCHRANE, J. On the 3d day of June, 1904, David Reilly lost his life, while in the employ of the defendant, in a clay bank used by the defendant in connection with the manufacture of brick. This bank extended from south to north, then curved to the west, and presented a face several hundred feet in length in its entirety. Its height was 65 or 70 feet. The face of the bank was not perpendicular, but the crest thereof receded about 20 feet from an imaginary vertical plane passing through the foot of the face. The bank consisted for the most part of clay resting on a substratum of sand. At the time of the accident Reilly and some of his fellow workmen were working on the floor of the bank near the curve above referred to, and from 10 to 20 feet from the slope of the bank. The complaint alleges that, "suddenly and without warning, said sand and clay bank gave way, and he, said David Reilly, was buried beneath tons of clay, sand, and earth, and did then and there meet his death." The bank began to give way 100 feet or more south of where Reilly was working. One of the workmen, who had left the bank temporarily, while returning, saw the beginning of the slide at this southern point, and gave the alarm to the workmen. The slide carried down a large portion of the bank, extending northerly from the point where it commenced to descend to a point behind where Reilly was at work, precipitating in its descent thousands of tons of earth of a thickness of about 20 feet, and causing the death of three workmen, including Reilly. In the preceding November a large slide had taken place in this bank, but only about one-half as extensive as the one in question. The deceased had worked there for a number of years, and was perfectly familiar with the conditions and surroundings. Intermediate the two slides of 1903 and 1904, no change whatever was made in the face of the bank. Such clay as was needed for the manufacture of brick was taken from that which fell in November, 1903, and it was this work in which Reilly was engaged at the time of his death. Seven men were thus em-

ployed, working in two gangs, shoveling the loose clay into carts, which, when loaded, were drawn to the kiln. At the time of the first slide there was dampness and moisture in the substratum of sand underlying the clay, but there is no evidence that any dampness or moisture in the stratum of sand underlying the clay which fell in 1904 existed at this latter time. Such sand was concealed by the earth which had fallen in 1903, and the evidence is that such earth had not been sufficiently removed to expose to view the underlying sand at the time of the slide in question. There is some evidence of the presence of water in the bank, and there was a natural gully some distance back from the crest of the bank and on the top thereof, in which, prior to the first slide, a witness had seen water, but the same witness testified that there was an outlet to the gully and no place for standing water.

The duty of the defendant to furnish a reasonably safe place for its workmen was commensurate with existing conditions and the natural and inherent dangers which pertained to the bank in question, and which might have been obviated by the exercise of reasonable care. It is not claimed in this case that the defendant committed any affirmative act of negligence, but that it omitted certain precautions which reasonable prudence required. It is urged by the plaintiff that the defendant failed in its duty to make the bank safe, because it did not remove the top thereof. The plaintiff refers to two methods of removing the top of a bank while working the same, viz., by the use of dynamite, and what is known as the "bench method," which is the removal of the top in such a way as to create a terrace or slope from the top down. Such methods, as distinguished from the ordinary method of undermining, are sometimes practiced when the bank is being used in the ordinary way for the special purpose of precipitating clay in comparatively small quantities to be gathered up from time to time for use in the process of brickmaking. But it must be remembered that this bank was not being operated or worked in the ordinary sense of the term. The face of this bank was as it had been left by nature after the slide in 1903. No undermining process had been resorted to. The plaintiff's witness Ferguson, who described these two methods of dynamiting and benching, also testified that, if the clay was already down upon the floor of the yard, neither one of these methods was used until such clay was removed. There is no evidence in the case of the use of either dynamite or of the bench method, except as a substitute for the ordinary process of undermining when a bank is being worked for the ordinary purpose of procuring clay for immediate use. On such occasions, of course, the precipitations are in comparatively small quantities, and are made from time to time. I think it would be rather exacting to hold that the defendant is liable for an omission of duty in not removing the whole of the top of this bank. There had been no interference with the bank, and, as has been seen, the face or slope thereof from the perpendicular was equal to nearly one-third of the actual height thereof. The contention that the top of the bank should have been removed in-

volves the proposition that the entire top thereof from the extreme
southerly point around the curve to the extreme westerly point, a
distance of hundreds of feet, should have been removed. And the
extent to which such removal would have been necessary in order
to have obviated the slide is entirely conjectural. Reasonable pru-
dence upon the part of the defendant in this case, under the circum-
stances which here existed, did not require the removal of the entire
top of the bank to an extent absolutely undefined and imaginary.

It is further urged that the defendant failed in its duty of inspec-
tion which it owed to the deceased. I am at a loss to see how any
inspection would have revealed the fact that this bank was about to
fall. There is no suggestion in the evidence of any flaw or crack
on the top or side of this or any other bank, or any other indication
of danger which would be discoverable before the fall actually oc-
curred. What the plaintiff means, however, by an inspection, is
that the defendant should have employed a watchman to watch the
bank for the greater safety of the employés; and this contention is
based on the fact that while working such banks there is usually
what is termed a "bank boss," whose duties vary according to the
nature of the work and number of men employed and otherwise.
But it does not appear that it is the exclusive duty of a bank boss to
watch for landslides. He participates in the ordinary work of the
workmen, but has in mind their safety, and pays attention to the
bank with reference thereto. And here again the plaintiff loses
sight of the fact that no undermining was in process at the time of
the accident, nor had there been for months. The duties of a bank
boss to look out for the safety of his men, according to the evidence
in this case, are confined to such times as they are engaged in the
work of actually precipitating clay for immediate use, a situation
which is entirely different from the one which existed here at the
time of the accident. Two witnesses, Duffney and Nolan, testified,
for the plaintiff, that an impending slide gives warning of its ap-
proach by small fragments of clay and sand becoming detached and
dropping. Duffney, on his cross-examination, confines his testi-
mony on this point to the case of a slide which is occasioned by
undermining for the purpose of causing the precipitation. Nolan's
testimony is exceedingly indefinite and unsatisfactory. He never
witnessed but one large slide. On that occasion, he says, if a per-
son had been in the bank he could not have escaped. At one time
he testified that a slide comes "just as quick as lightning." As-
suming, however, that the testimony of these witnesses justifies an
inference that slides give a warning of four or five minutes, I do not
think the defendant can be charged with negligence for not antici-
pating this slide and procuring a watchman to watch the bank. It
is not customary to take such precaution. On the contrary, the un-
disputed testimony is that it is customary not to do so. In only
one other instance does such precaution seem to have been taken,
and in that case without avail, as a life was lost notwithstanding
the precaution. If a watchman had been on guard whose exclu-
sive duty it was to be on the lookout for this slide, his duty would

have taken him to different parts of the bank for the protection of both of the gangs of men in question, and, to have prevented this catastrophe by giving sufficient warning, it would have been necessary for the remarkable coincidence to have existed that at the particular time just preceding the fatal moment his gaze should have been directed toward the particular place in this large area where the unexpected movement began to manifest itself.

The difficulty with the plaintiff's case is that the accident resulted solely from a manifestation of nature. It was an act of Providence, which was not contributed to in any respect by any human agency. The bank was just as nature left it by the slide of 1903. Not a particle of earth was thereafter removed from the face thereof. The bank was different in its features, contour, and characteristics after the slide of 1903 than it was before, and hence that slide was no indication or warning that another slide would occur. Under the evidence in this case, the defendant did not omit any of the ordinary usages or precautions of the business or employment, or any safeguards which prudent men in the exercise of reasonable caution should have provided, and hence is not chargeable with negligence.

Complaint dismissed.